Case 1:17-mj-01417-BPG Document 3 Filed 05/30/17 Page 1 of 17

17-1417 BPG

FILED
LOGGED

MAY 30 2017

CLERK, U.S. DISTRICT COURT
AT BALTIMORE
DISTRICT OF MARYLAND
BY

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

I, Christian Armiger, being duly sworn, depose and state as follows:

1. This Affidavit is made in support of an application for a warrant to search the following cellular telephones (the "TARGET PROPERTY"):

   a) a black ZTE cellular telephone with a cracked screen (S/N: 32BC529169E5, IMEI: 868485023119880);

   b) a black Samsung Galaxy Note 4 with a black case (IMEI: 356204068050945);

   c) a black Alcatel OneTouch (MEID: 270113185014325209); and

   d) an LG cellular telephone with a cracked screen (S/N:601CYMR0537899).

## TRAINING AND EXPERIENCE

2. The name of your Affiant is Sergeant Christian Armiger of the Maryland State Police, Criminal Enforcement Division, currently assigned as the commander of the Delivery Systems Parcel Interdiction Initiative. I have been a Maryland State Trooper for over fifteen years and has been assigned to the Criminal Enforcement Division since March of 2012. I received six months of basic training at the Maryland State Police Training Academy that included courses in constitutional law, Maryland state law, and the enforcement of the controlled dangerous substance laws of this state.

3. I have been a Task Force Officer with the Drug Enforcement Administration since 2017. As such, I am authorized to exercise the powers of law enforcement personnel set forth in Title 21, United States Code, Section 878, which include the power to execute and serve arrest warrants, search warrants, administrative inspection warrants, subpoenas, and summonses issued under the authority of the United States.

4. I have received training in the identification of controlled substances through: (1)

the Maryland State Police Training Academy which he completed in December 2001; (2) NIK Polytesting System on narcotics identification 2001; and (3) Narcotics Detection K9 handler school September-December 2006. I attended the NHTSA certified "Conducting the Complete Traffic Stop" school hosted by the Maryland State Police in 2002 & 2008. I also completed the six-week Pro Active Criminal Enforcement (P.A.C.E) training school hosted by the Maryland State Police P.A.C.E. Team in 2004. Further, I attended the four-day Maximum Concealment hidden compartment/drug trend training school in Raleigh, NC in 2004. Further, I attended the week long "Top Gun" basic drug investigators school hosted by the National Counter Drug Training Center and the Maryland State Police in April 2012. I also attended "SKYNARC" training in New Orleans, LA hosted by the International Narcotics Investigator Association in 2016. I also attended a one-day Aerial Marijuana Observation course hosted by the Maryland State Police in 2012.

5. In addition to the above listed training and education, I have made numerous arrests for violation of controlled dangerous substances laws. These events have resulted in convictions in the District and Circuit Courts in the State of Maryland and in the United States District Courts for the Eastern District of Pennsylvania and the District of Maryland. Since being assigned to the Drug Enforcement Division, I have participated in the execution of numerous search and seizure warrants. During the service of these warrants, I assisted in the seizure of illegal drugs and drug paraphernalia. I have initiated, investigated, and participated in investigations in which controlled dangerous substances have been purchased from street level drug deals.

6. I have witnessed and participated in several controlled purchases of controlled dangerous substances. I have been the primary officer and the assisting officer in numerous on-view narcotics arrests while on patrol with the Maryland State Police.

7. As a result of the experience and training received from the aforementioned schools

and investigations, I am familiar with the actions, traits, habits and terminologies utilized by individuals involved in the drug violations. I know:

      a)      Drug traffickers and manufacturers very often use fictitious names and/or fictitious business names to ship and/or receive packages containing illegal contraband to avoid detection by government agencies.

      b)      Drug traffickers and manufacturers very often use fictitious phone numbers and addresses for the senders/recipients of the packages, often times using phone numbers that are not in service and addresses that do not exist and/or incorrect information (i.e. misspelled names, improper zip codes, etc.).

      c)      Drug traffickers and manufacturers often times ship packages containing illegal contraband from a shipping store (e.g., FedEx/Kinkos, The UPS Store) to distance the packages from their true identities and places of business or even their home addresses.

      d)      Drug traffickers and manufacturers frequently pay cash to ship these packages containing illegal contraband in order to distance themselves from the package and to make it more difficult for law enforcement to trace the payments.

      e)      Drug traffickers and manufacturers often times use excessive tape and/or even glue on the lids of their contraband packages in an effort to keep any odors of illegal controlled dangerous substances from emanating from within the parcels. These parcels also often emanate the odor of masking agents (e.g., coffee, laundry detergent, fabric softener) all commonly used to mask the odor from the use of K-9 detection.

      f)      Drug traffickers and manufacturers often times reinforce their contraband packages in an effort to reduce the possibility of the parcels being damaged in the shipping process and the illegal contraband being discovered inside. As a result of this, the packages often times are center heavy and present as a solid mass inside.

g) Drug traffickers and manufacturers often times break up their shipments into multiple parcels and use multiple addresses in an effort to avoid detection, increase the probability of the delivery of the parcels and decrease the amount of controlled dangerous substances intercepted.

8. The DEA and Maryland State Police have investigated numerous cases in which mail and express shipping companies have been used to transport drugs and the payment for drugs to and from the Baltimore/Washington area, from the known drug source areas of Florida, California, Arizona, Texas, and New York (and other states). Past experience and drug trafficking intelligence have demonstrated that mail services are frequently used by drug dealers for the payment of narcotics and for the shipping of controlled substances including, but not limited to, methamphetamine, cocaine, heroin, hallucinogenic mushrooms, and marijuana. Use of these services is favored because of the reliability, speed, low cost, and ability to track the package, as well as the low risk chance of detection of drugs being shipped in this manner.

9. The facts and information contained in this Affidavit are based on my personal knowledge as well as that of the other agents involved in this investigation. All observations that were not made personally by me were related to me by the persons who made the observations. This Affidavit contains that information necessary to establish probable cause in support of a warrant to search the TARGET PROPERTY. This Affidavit is not intended to include each and every fact and matter observed by or made known to agents of the government.

## **PROBABLE CAUSE**

10. Beginning in or about October 2016, the Maryland State Police received an anonymous tip that JEFFERY HARRINGTON was receiving FedEx packages containing methamphetamine on a weekly basis at his residence, 1703 Sage Brook Ct, Severn, MD 21144 (the "HARRINGTON RESIDENCE"). Searches in databases available to the public and those available only to law enforcement reported HARRINGTON as the owner of the HARRINGTON

RESIDENCE. Additionally, the Maryland Department of Motor Vehicles reported the HARRINGTON RESIDENCE as HARRINGTON's current residence, and vehicles registered to HARRINGTON were registered to the same address as the HARRINGTON RESIDENCE.

11. A search of law enforcement systems revealed that in March 2011, law enforcement seized a FedEx package, addressed to the HARRINGTON RESIDENCE, which contained approximately 67 grams of methamphetamine. HARRINGTON was arrested and charged, however the Anne Arundel County State's Attorney's Office elected not to prosecute.

12. In late 2016, law enforcement served FedEx with an administrative subpoena for all packages shipped to the HARRINGTON RESIDENCE. Information provided pursuant to the administrative subpoena, reported approximately forty-six (46) packages shipped from Dallas, Texas to the HARRINGTON RESIDENCE between October 2015 and December 2016. Specifically, the packages were shipped to "Linda Berry" at the HARRINGTON RESIDENCE. All of the packages were shipped from "Customer Service" "PBMOBES."

13. Using both databases available to the public and those available only to law enforcement, a database search of the recipient "Linda Berry" could not be located at the HARRINGTON RESIDENCE. Your Affiant knows, through training and experience, that individuals who commonly use FedEx to facilitate the transportation of controlled dangerous substances often use either false names, addresses and phone numbers, or real addresses and phone numbers other than their own, in the labeling of shipments of controlled dangerous substances. Such individuals have also utilized variations of correct names, addresses and phone numbers in the labeling of shipments of controlled dangerous substances. The purpose of these tactics is an attempt by such individuals to distance themselves from the contraband should it be intercepted by law enforcement. It should be noted that the package shipped to the HARRINGTON RESIDENCE in March 2011 was shipped to a name that was not associated with the

HARRINGTON RESIDENCE.

14. A review of additional information received from FedEx regarding the shipper of the packages, identified PATRICK MOBLEY as the FedEx account owner for all packages shipped to the HARRINGTON RESIDENCE. Credit card information linked to MOBLEY's FedEx account revealed that MOBLEY has multiple bank accounts at Wells Fargo Bank. A review of MOBLEY's Wells Fargo bank accounts identified approximately 42 cash deposits, totaling $61,256, between February 2016 and January 2017, made at approximately three Wells Fargo branch locations in Maryland. All of the deposits were made at Wells Fargo branches located within two to nine miles of the HARRINGTON RESIDENCE, with a maximum drive time of 15 minutes. A further review of the cash deposits made to MOBLEY's bank account, coordinated with FedEx parcels shipped from MOBLEY to the HARRINGTON RESIDENCE, indicates that out of the 42 cash deposits made into MOBLEY's bank account from Maryland locations, 31 cash deposits (approximately 74%) coincided with a shipment of a FedEx package to the HARRINGTON RESIDENCE on the same day. The remaining 11 cash deposits (approximately 26%) were made the day before or the day after a FedEx package was shipped from MOBLEY to the HARRINGTON RESIDENCE.

15. A review of Wells Fargo video surveillance on December 28, 2016, in Elkridge, Maryland identified HARRINGTON's vehicle in the far drive-thru lane at the bank. Wells Fargo provided the photo of the vehicle used to make the deposit. Law enforcement noted the vehicle is the same make and model of a vehicle operated and registered to HARRINGTON, which was utilized to make a $1,600 deposit into MOBLEY's bank account.

16. On February 16, 2017, the Maryland State Police and the DEA received information that a FedEx package (Tracking # 778441731197) addressed to the HARRINGTON RESIDENCE (the "SUBJECT PARCEL") was intercepted at the FedEx Mailing facility located

at 719 North Hammonds Ferry Rd, Linthicum Heights, MD 21090. The SUBJECT PARCEL was addressed to "Linda Berry, 1703 Sage Brook Ct, Severn, MD 21144" from "Patrick Mobley, PBMOBES, 1001 Ross Avenue, Apt. 447, Dallas, TX 75202."

17. On February 16, 2017, law enforcement hid the SUBJECT PARCEL among other boxes and envelopes in the parking lot of the listed FedEx facility. Maryland State Police Sgt. Matthew Murphy and his narcotic detecting canine "Mia" were brought in to search for the SUBJECT PARCEL among the other boxes and envelopes. Mia alerted on the SUBJECT PARCEL. Mia is certified on an annual basis to alert on the odors of controlled dangerous substances, including but not limited to cocaine, heroin, methamphetamine, and marijuana (THC), and is trained on a monthly basis to ensure her accuracy. This certification process is done according to national accepted standards for training drug detection canines. Mia was last certified by the Maryland State Police Canine Unit in November 2016. Maryland State Police Canine Unit trains canines to display a behavioral change upon locating the controlled dangerous substances they have been certified to alert on. The canine is trained to come to a final response by biting, scratching, sitting, and barking at the source of the substance detected. Here, your Affiant knows that Mia's alert on the SUBJECT PARCEL signals the presence of one or more controlled substances inside of the SUBJECT PARCEL.

18. On February 16, 2017, based on the outlined facts, law enforcement obtained and executed a state search warrant from the District Court for Baltimore County, Maryland on the SUBJECT PARCEL which resulted in the seizure of approximately 63.4 grams of suspected crystal methamphetamine. The package contained several layers of packaging, including plastic bags, a cardboard box, and a black tin. The black tin contained two baggies containing the suspected crystal methamphetamine. The suspected crystal methamphetamine was placed in an evidence bag. Law enforcement conducted a preliminary field-test which resulted in a positive

response for methamphetamine.

19. On February 16, 2017, Maryland State Police placed a representative sample of approximately five grams the controlled substance inside one of the baggies from the SUBJECT PARCEL and a sham substance in the second baggie. Both baggies were placed back into the black tin and re-packaged under the layers of packaging described above, and the package was resealed.

20. At approximately 10:00 a.m. on February 16, 2017, law enforcement conducted surveillance at the HARRINGTON RESIDENCE and observed HARRINGTON and two to three male subjects depart the HARRINGTON RESIDENCE in a silver Mazda sport utility vehicle registered to HARRINGTON (the "HARRINGTON VEHICLE").

21. At approximately 10:17 a.m., a law enforcement officer working in an undercover capacity as a delivery person effectuated a controlled delivery of the SUBJECT PARCEL to the HARRINGTON RESIDENCE and placed the package near the front door of the HARRINGTON RESIDENCE.

22. At approximately 11:20 a.m., law enforcement officers observed the HARRINGTON VEHICLE return to the vicinity of the HARRINGTON RESIDENCE. A male subject was observed picking up the SUBJECT PARCEL from near the front door of the HARRINGTON RESIDENCE, walking away from the HARRINGTON RESIDENCE, and entering the HARRINGTON VEHICLE. The male subject was later identified as CHARLES TODD. The HARRINGTON VEHICLE then departed and was pursued by law enforcement.

23. Law enforcement officers in pursuit of the HARRINGTON VEHICLE observed the vehicle as it entered and traveled northbound on Maryland Route 295. Law enforcement officers traveling northbound on Route 295 in an unmarked vehicle attempted to conduct a traffic stop of the HARRINGTON VEHICLE by flashing lights. The HARRINGTON VEHICLE did

not stop and continued to travel northbound on Route 295. While in pursuit of the HARRINGTON VEHICLE, your Affiant observed the hands of a passenger in the Mazda vehicle outside the front passenger window holding a plastic bag and white substances falling out of the bag along the side of the highway.

24. The HARRINGTON VEHICLE pulled over near the West Nursery Road exit on Route 295, which is in Anne Arundel County, Maryland. HARRINGTON was seated in the front passenger seat and a subject seated in the front passenger seat was identified as CHARLES TODD, also known as "Chaz." HARRINGTON and TODD were taken into custody. Law enforcement officers observed the packaging of SUBJECT PARCEL on the rear floor board of the HARRINGTON VEHICLE. The contents of the SUBJECT PARCEL had been removed.

25. After the arrests of HARRINGTON and TODD, law enforcement seized four cellular telephones:

   a) an Apple iPhone;

   b) a black ZTE cellular telephone with a cracked screen (S/N: 32BC529169E5, IMEI: 868485023119880);

   c) a black Samsung Galaxy Note 4 with a black case (IMEI: 356204068050945); and

   d) a black Alcatel OneTouch (MEID: 270113185014325209).

26. On February 16, 2017, a federal Criminal Complaint was filed charging HARRINGTON with conspiracy to distribute, and to possess with intent to distribute, fifty (50) grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and use of a communication facility to cause and facilitate distribution of, and possession with intent to distribute, methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 843(b).

27. TODD was charged in the Maryland District Court for Anne Arundel County with possession with intent to distribute controlled dangerous substances and related offenses. TODD was released after a bond hearing on February 17, 2017.

28. On February 23, 2017, law enforcement responded to reports of violent threats made by TODD at the HARRINGTON RESIDENCE and arrested TODD. At that time, law enforcement seized from TODD an LG cellular telephone with a cracked screen (S/N:601CYMR0537899), a vial containing a suspected controlled substance, and other items.

29. On February 24, 2017, a federal Criminal Complaint was filed charging TODD as an accessory after the fact to possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 3, based upon the events of February 16, 2017.

30. The Apple iPhone seized on February 16, 2017, was determined to have been owned and used by HARRINGTON. An examination of the Apple iPhone revealed text message correspondence between HARRINGTON and a contact listed as "Chaz," believed to be TODD, during the week prior to their arrest on February 16, 2017, in which the two discussed illegal drug sales and purchasing a re-supply of drugs.

31. On March 15, 2017, the Grand Jury returned an Indictment charging BERNARD THOMAS MOZDENSKI III, MOBLEY, HARRINGTON, and TODD with conspiracy to distribute, and to possess with intent to distribute, fifty (50) grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and use of communications facilities to facilitate the conspiracy, in violation of 21 U.S.C. § 843(b).

32. The following cellular telephones (the "TARGET PROPERTY") were seized and are currently being held at Washington/Baltimore HIDTA DSPII, 6797 Dorsey Road, Jessup, Maryland:

    a) a black ZTE cellular telephone with a cracked screen (S/N: 32BC529169E5,

IMEI: 868485023119880);

    b)    a black Samsung Galaxy Note 4 with a black case (IMEI: 356204068050945);

    c)    a black Alcatel OneTouch (MEID: 270113185014325209); and

    d)    an LG cellular telephone with a cracked screen (S/N:601CYMR0537899).

## CELLULAR TELEPHONES

33.    Based on training and experience, I know that (a) many cellular telephones have an address/phone book feature, which allows the user to store names and telephone numbers in the telephone's memory; (b) many cellular telephones incorporate a Caller ID feature to capture and store the telephone number of incoming calls; (c) in addition to the ability to store names and numbers, many cellular telephones have the technical capability to store email, text, photographs, IP addresses, geographic locations and voice recordings; and (d) the analysis of the names, telephone numbers and other data contained in cellular telephones is very useful to law enforcement and provides valuable evidence concerning the scope of users' activities.

34.    Based on training and experience, I know that electronic devices, such as cellular telephones, can store information for long periods of time. This information can sometimes be recovered with forensics tools.

35.    Based on training and experience, I know that those engaged in the sale of illicit drugs, including methamphetamine, will use telephones, including cellular telephones, to assist them with their drug trafficking endeavors. They will use cellular telephones to accept orders from drug customers and to assist them in determining locations to meet their customers to complete the drug transaction. Drug traffickers can use telephone calls and conversations, voice messages, text messages, and instant messages to communicate back and forth with their customers. They will also use cellular telephones to contact their source of supply in order to "re-

up" their drug supply from their sources of supply. I have known drug traffickers to take photographs and video of their drug customers and their drug suppliers, sometimes due to the nature of their relationship with the customer or supplier. These photographs and video can also be taken in or at social events if they travel in the same social circles. Drug traffickers will often store the contact information, including cellular telephone numbers, of drug customers and sources of supply in the "Contacts" area of their cellular telephone. They may attempt to hide the true name of the drug customer of source of supply by using an alias, initial, or some other description to annotate the actual customer or source of supply in the contacts of their cellular telephone. It should further be noted that the supplier/customer relationship can sometimes be determined through the analysis of text messages that are both sent and received. These text messages can sometimes determine the supplier/customer relationship based on who initiated the contact, such as who is requesting what and who is demanding payment. The content of the text messages can also contain specific information related to drug trafficking, including known drug terminologies, known drug amounts and the current cost of known drug quantities.

36. As further described in the attachments to this Affidavit, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET PROPERTY was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET PROPERTY for the following reasons:

    a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b) Forensic evidence on a device can also indicate who has used or controlled

the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c) A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e) Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37. Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, examination of the device consistent with the warrant is permitted in that the examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

38. Based on the facts and information as stated in this Affidavit, there is probable cause to believe that JEFFERY HARRINGTON and CHARLES TODD knowingly and

intentionally conspired with others to distribute and to possess with intent to distribute quantities of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and knowingly and intentionally used cellular telephone services in facilitating the aforementioned felony drug trafficking conspiracy, in violation of 21 U.S.C. § 843(b). There is further probable cause to believe that the TARGET PROPERTY was used in committing the aforementioned offenses and will contain evidence of these offenses.

Christian Armiger
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me this 15th day of May, 2017.

The Honorable Beth P. Gesner
United States Magistrate Judge
for the District of Maryland

## **ATTACHMENT A**

DESCRIPTION OF ITEMS TO BE SEARCHED

The following items (the "TARGET PROPERTY") were seized and are currently being held at Washington/Baltimore HIDTA DSPII, 6797 Dorsey Road, Jessup, Maryland:

a) a black ZTE cellular telephone with a cracked screen (S/N: 32BC529169E5, IMEI: 868485023119880);

b) a black Samsung Galaxy Note 4 with a black case (IMEI: 356204068050945);

c) a black Alcatel OneTouch (MEID: 270113185014325209); and

d) an LG cellular telephone with a cracked screen (S/N:601CYMR0537899).

## ATTACHMENT B

LIST OF ITEMS TO BE SEIZED

1. There is probable cause to believe that the following items, which constitute evidence of conspiracy to distribute and to possess with intent to distribute methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, use of a communications facility in facilitating the aforementioned felony drug trafficking conspiracy, in violation of 21 U.S.C. § 843(b), will be found on the TARGET PROPERTY:

    a. Records, documents, programs, applications, photographs, video or audio recordings, call history information, text messages and other cellular telephone communications, social media postings, stored phone numbers or address book contacts, voice mails stored in any form, and other digital evidence, that refer or relate to drugs, drug trafficking, or firearms.

    b. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show the actual user(s), owner or possessor of the TARGET PROPERTY.

    c. Contact list/phone numbers for possible co-conspirators in drug trafficking, drug trafficking clients, or suppliers of drugs or firearms.

2. The search procedure of the electronic data for the items described in paragraph 1 that is contained may include the following techniques which shall be used to minimize the risk that those conducting the search will view information not within the scope of the warrant.

    a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

  b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

  c. "scanning" storage areas to discover and possible recover recently deleted files;

  d. "scanning" storage areas for deliberately hidden files; or

  e. performing key word or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation or the items set forth in Paragraph 1 above.

3. If the search of the TARGET PROPERTY reveals contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that TARGET PROPERTY pending further order of Court.

4. If after performing these procedures, the directories, files or storage areas do not reveal evidence of, relate to or constitute evidence, fruits, or instrumentalities of the aforementioned violations, the further search of that TARGET PROPERTY shall be terminated.